**No. 26-2459**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

---

CHRIS WOLTERS,

*Plaintiff- Appellee*,

v.

SWEEPSTEAKS LIMITED D/B/A STAKE.US

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Minnesota
No. 0:25-cv-03280, Hon. John R. Tunheim

---

# APPELLEE'S ANSWERING BRIEF

---


Garrett D. Blanchfield
REINHARDT WENDORF & BLANCHFIELD
80 South Eighth Street, Suite 900
Minneapolis, MN 55402
(651) 287-2100
*g.blanchfield@rwblawfirm.com*

Daniel C. Hedlund
Daniel J. Nordin
Joe E. Nelson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
*dhedlund@gustafsongluek.com*
*dnordin@gustafsongluek.com*
*jnelson@gustafsongluek.com*

Michael Skocpol
Shelby Leighton
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
*mskocpol@publicjustice.net*
*sleighton@publicjustice.net*

Vildan Teske
Lee Owen
TESKE LAW PLLC
80 South Eighth Street, Ste. 900
Minneapolis, MN 55402
(612) 767-0521
*teske@teskelaw.com*
*owen@teskelaw.com*

*Counsel for Appellee Chris Wolters*

## SUMMARY OF THE CASE AND STATEMENT ON ORAL ARGUMENT

Stake.us is an unlicensed virtual casino operated out of Cyprus. It doesn't contest on appeal that its business is illegal in Minnesota, where unlicensed commercial gambling is a crime. Nor does it contest that in Minnesota, any contract for its gambling services is therefore "void and of no effect." Minn. Stat. § 541.21. This appeal asks whether Stake can nonetheless enforce an arbitration clause in its user Terms and Conditions against Chris Wolters, a Minnesota resident who lost tens of thousands of dollars compulsively gambling with Stake.

The district court was right: Stake cannot. The illegality of Stake's transactions with Mr. Wolters means that he and Stake could not, and did not, ever form an enforceable contract. The Terms themselves confirm that: Stake refuses to transact with anyone in states where its services are outlawed, and it reserves the right to change its Terms "effective immediately" "at any time." So Minnesotans like Mr. Wolters can neither accept Stake's contract nor rely on its promises as valid consideration. The district court was also correct that Stake has not carried its burden to show Mr. Wolters' assent, so at the very least more factual development is needed on that question. Finally, even if a contract *were* formed—such that the arbitration provision and delegation clause must be severed from the broader agreement—many of the same problems also invalidate those provisions. This Court should affirm.

Mr. Wolters joins Stake's request for 15 minutes of oral argument per side.

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT ON ORAL ARGUMENT........ i

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF THE CASE...........................................................................5

I. Legal and factual background ...............................................................5

A. Commercial gambling is illegal in Minnesota............................5

B. Stake operates an unregulated, unlicensed, for-profit virtual casino in Minnesota. ....................................................................6

C. Mr. Wolters lost tens of thousands of dollars compulsively gambling with Stake. ...................................................................9

II. Procedural background.........................................................................10

SUMMARY OF THE ARGUMENT ..............................................................13

STANDARD OF REVIEW ............................................................................16

ARGUMENT ..................................................................................................16

I. The Court must first decide whether a contract exists before deciding whether an arbitration provision—including a delegation clause—is otherwise enforceable......................................................................16

II. Stake cannot compel arbitration because no contract was ever formed between the parties. .......................................................................20

A. No contract was formed because an illegal gambling contract is void under Minnesota law.........................................................21

B. Stake's Terms and Conditions confirm that the contract's illegality is a formation problem...............................................27

C. No contract was formed because Stake failed to promise any non-illusory consideration. ....................................................31

III. The arbitration agreement and delegation clause, specifically, are invalid and unenforceable. ..................................................................36

IV. Alternatively, Stake has not come forward with sufficient undisputed material facts to establish that a contract was formed. ........................43

V. The remaining unconscionability challenges should be decided by the district court in the first instance. ........................................................50

CONCLUSION .........................................................................................51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)....................3, 44, 45, 47, 49

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................47

*Applebaum v. Lyft, Inc.*,
263 F. Supp. 3d 454 (S.D.N.Y. 2017)....................44

*Ballou v. Asset Marketing Services, LLC*,
46 F.4th 844 (8th Cir. 2022)....................44, 49

*Bazemore v. Jefferson Capital Systems, LLC*,
827 F.3d 1325 (11th Cir. 2016)....................45

*Benchmark Ins. Co. v. SUNZ Insurance Solutions Co.*,
36 F.4th 766 (8th Cir. 2022)....................25, 26

*Blackford v. Prairie Meadows Racetrack and Casino, Inc.*,
778 N.W.2d 184 (Iowa 2010)....................27, 30, 31

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)....................*passim*

*Carey v. 24 Hour Fitness, USA, Inc.*,
669 F.3d 202 (5th Cir. 2012)....................43

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)....................*passim*

*Cooper Indus., Inc. v. Aviall Services, Inc.*,
543 U.S. 157 (2004)....................41

*Cooper v. Finke*,
35 N.W. 469 (Minn. 1887) ....................................................................1, 23

*Day v. Case Credit Corp.*,
427 F.3d 1148 (8th Cir. 2005) ..........................................................................24

*Donelson v. Ameriprise Financial Services, Inc.*,
999 F.3d 1080 (8th Cir. 2021) ..........................................................................34

*Estate of Peterson*,
579 N.W.2d 488 (Minn. Ct. App. 1998)..............................................................32

*Everson v. J. L. Owens Manufacturing Co.*,
176 N.W. 505 (Minn. 1920) .............................................................1, 27, 30, 31

*Fedor v. United Healthcare, Inc.*,
976 F.3d 1100 (10th Cir. 2020) ........................................................................19

*Foster v. WalMart, Inc.*,
15 F.4th 860 (8th Cir. 2021) ...............................................................3, 44, 47, 49

*Garden v. Central Nebraska Housing Corp.*,
719 F.3d 899 (8th Cir. 2013) ............................................................................51

*Granite Rock Co. v. International Brotherhood of Teamsters*,
561 U.S. 287 (2010)....................................................................................16, 19

*Grouse v. Group Health Plan, Inc.*,
306 N.W.2d 114 (Minn. 1981) .........................................................2, 31, 32, 33

*Heintz v. Cambridge Investment Research, Inc.*,
2019 WL 6461312 (Minn. Ct. App. Dec. 2, 2019)...........................................24

*In re Disciplinary Action Against Riehm*,
883 N.W.2d 223 (Minn. 2016) ....................................................................21, 31

*In re Running Aces Casino*,
30 N.W.3d 285 (Minn. 2026) ...........................................................................22

*In re Stevens County for a Conditional Use Permit*,
2023 WL 5696623 (Minn. Ct. App. Sept. 5, 2023).....................................23, 24

*In re Welfare of D.D.G.*,
553 N.W.2d 86 (Minn. Ct. App. 1996)....................................................33

*Isles Wellness, Inc. v. Progressive Northern Insurance Co.*,
725 N.W.2d 90 (Minn. 2006)....................................................22, 26

*Johnson v. Continental Finance Co.*,
131 F.4th 169 (4th Cir. 2025)....................................................*passim*

*Johnson v. Menard, Inc.*,
632 S.W.3d 791 (Mo. Ct. App. 2021)....................................................43

*Jorgensen Chevrolet Co. v. First National Bank of Red Wing*,
14 N.W.2d 618 (Minn. 1940)....................................................27, 30, 31

*Kater v. Churchill Downs Inc.*,
423 F. Supp. 3d 1055 (W.D. Wash. 2019)....................................................47

*Koch v. Compucredit Corp.*,
543 F.3d 460 (8th Cir. 2008)....................................................18, 26

*Laclede Gas Co. v. Amoco Oil Co.*,
522 F.2d 33 (8th Cir. 1975)....................................................33

*Lew Bonn Co. v. Herman*,
135 N.W.2d 222 (Minn. 1965)....................................................1, 22, 39

*Macon County Greyhound Park, Inc. v. Hoffman*,
226 So. 3d 152 (Ala. 2016)....................................................3, 39, 40, 41

*Metropolitan Transportation Network, Inc. v. Collaborative Student Transportation of Minnesota, LLC*,
6 N.W.3d 771 (Minn. Ct. App. 2024)....................................................31

*Meyer v. Uber Techs, Inc.*,
868 F.3d 66 (2d Cir. 2017)....................................................44

*MZM Construction Co. v. New Jersey Building Laborers Statewide Benefit Funds*,
974 F.3d 386 (3d Cir. 2020)....................................................19

*National Federation of the Blind v. The Container Store, Inc.*,
904 F.3d 70 (1st Cir. 2018) .......... 3, 42

*Nelson v. Watch House International, LLC*,
815 F.3d 190 (5th Cir. 2016) .......... 34

*Onvoy, Inc. v. SHAL, LLC*,
669 N.W.2d 344 (Minn. 2003) .......... 24

*Pizza Hazel, Inc. v. Am. Express Co.*,
2025 WL 3023060 (D. Mass. May 19, 2025) .......... 35, 43

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*,
388 U.S. 395 (1967) .......... 17

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) .......... *passim*

*Schlacks v. Chheda*,
174 F.4th 1061 (8th Cir. 2026) .......... *passim*

*Service Restoration, Inc. v. Evanston Insurance Co.*,
No. 24-cv-938, 2025 WL 3228210 (D. Minn. Nov. 19, 2025) .......... 31, 32

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) .......... 3, 45, 47

*Solymar Investments, Ltd. v. Banco Santander S.A.*,
672 F.3d 981 (11th Cir. 2012) .......... 19, 20

*Urdan v. Sweepsteaks Ltd.*,
No. 25-cv-3736 (N.D. Ill. Oct. 16, 2025), Dkt. No 31 .......... 3, 48, 49

*Zurn v. Zurn*,
2025 WL 301176 (Minn. Ct. App. 2025) .......... 24

**Statutes and Regulations**

9 U.S.C. §§ 2–4 .......... 1, 2, 3, 4

9 U.S.C. § 2 .......... 37, 38

9 U.S.C. § 4 .......... 17, 48

Minn. Admin. Code §§ 7861.0210 *et seq*. .....5

Minn. Admin. Code § 7861.0220 .....6

Minn. Admin. Code § 7861.0260 .....6, 9

Minn. Admin. Code § 7861.0300 .....6

Minn. Admin. Code § 7861.0310 .....6

Minn. Stat. § 349.12 .....5

Minn. Stat. § 349.15 .....5

Minn. Stat. § 349.16 .....5, 22

Minn. Stat. §§ 349.155 .....22

Minn. Stat. § 541.20 .....10

Minn. Stat. § 541.21 ..... 1, 2, 23, 39

Minn. Stat. § 609.76 .....1, 5, 22, 29

**Other Authorities**

Restatement (Second) of Contracts (1981) ..... 21, 27

Black's Law Dictionary (12th ed. 2024) .....24

## STATEMENT OF THE ISSUES

**1. Contract Formation – Illegality.** Stake has not disputed that, under Minnesota law, its Terms and Conditions are an illegal gambling contract that is "void and of no effect." Minn. Stat. § 541.21. Does that illegality preclude formation of any contract between Stake and Mr. Wolters, such that there is no contractual basis to compel arbitration here?

**Apposite Statutes**

- Federal Arbitration Act, 9 U.S.C. §§ 2–4.
- Minnesota Statutes § 541.21
- Minnesota Statutes § 609.76, subdivision 1

**Apposite Cases**

- *Schlacks v. Chheda*, 174 F.4th 1061 (8th Cir. 2026)
- *Cooper v. Finke*, 35 N.W. 469 (Minn. 1887)
- *Lew Bonn Co. v. Herman*, 135 N.W.2d 222 (Minn. 1965)
- *Everson v. J. L. Owens Manufacturing Co.*, 176 N.W. 505 (Minn. 1920)

**2. Contract Formation – Lack of Consideration.** Stake's Terms expressly disclaim any obligation to "interact in any way" with users in states where its business is illegal. Stake's Terms also empower the company to alter its commitments to its users "at any time" and make those changes "binding" "effective immediately." App. 117; R. Doc. 16-2, at 30. Are Stake's promises to users in

Minnesota illusory, such that it has not provided meaningful consideration, and therefore no contract was formed?

**Apposite Statute**

- Federal Arbitration Act, 9 U.S.C. §§ 2–4

**Apposite Cases**

- *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114 (Minn. 1981)
- *Johnson v. Continental Finance Co., LLC*, 131 F.4th 169 (4th Cir. 2025)

**3. Enforceability of Delegation Provision.** Even if illegality and lack of consideration did not prevent a contract from being formed between Stake and Mr. Wolters, are Stake's delegation clause and arbitration provision nevertheless unenforceable—either because they are expressly conditioned on agreeing to an illegal gambling contract and therefore void under Minnesota law, or else because they can be changed at any time and are therefore illusory?

**Apposite Statutes**

- Federal Arbitration Act, 9 U.S.C. §§ 2–4
- Minnesota Statutes § 541.21

**Apposite Cases**

- *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024)
- *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010)

- *National Federation of the Blind v. The Container Store, Inc.*, 904 F.3d 70 (1st Cir. 2018)
- *Macon County Greyhound Park, Inc. v. Hoffman*, 226 So. 3d 152 (Ala. 2016)

**4. Contract Formation – Proof of Assent.** To prove that Mr. Wolters assented to its Terms and Conditions, Stake relied on a bare-bones declaration that provides very little information about the structure, design, or context of the online interfaces through which Mr. Wolters supposedly manifested assent. Was Stake's evidence sufficient to carry its burden to establish mutual assent as a matter of law, or (as the district court held) is additional factual development needed?

**Apposite Statute**

- Federal Arbitration Act, 9 U.S.C. §§ 2–4.

**Apposite Cases**

- *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)
- *Foster v. WalMart, Inc.*, 15 F.4th 860 (8th Cir. 2021)
- *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016)
- Order, *Urdan v. Sweepsteaks Ltd.*, No. 25-cv-3736 (N.D. Ill. Oct. 16, 2025), Dkt. No 31

**5. Proper Disposition of Unconscionability Challenges.** In the district court, Mr. Wolters challenged enforceability on unconscionability grounds that apply to both the delegation provision and the broader arbitration agreement. The district

court did not reach those issues. If this Court doesn't affirm, should Wolters' unconscionability challenges be left for the district court to address in the first instance on remand?

**Apposite Statute**

- Federal Arbitration Act, 9 U.S.C. §§ 2–4

**Apposite Case**

- *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024)

## STATEMENT OF THE CASE

### I. Legal and factual background

#### A. Commercial gambling is illegal in Minnesota.

Unlicensed commercial gambling is a crime in Minnesota. The state strictly prohibits for-profit gambling operations. Minn. Stat. § 609.76, subd. 1(1), (4), (7). Specifically, it is a gross misdemeanor in Minnesota to "maintain[] or operate[] a gambling place," "set[] up for use for the purpose of gambling, or collect[] the proceeds of, any gambling device," and to "receive[], record[], or forward[] bets or offers to bet." Minn. Stat. § 609.76, subd. 1(1), (4), (7).

The law makes only limited exceptions, mainly for non-profit organizations. *See* Minn. Stat. § 349.16, subd. 1; Minn. Stat. § 349.12, subd. 28. And even then, qualifying organizations must be licensed, have a brick-and-mortar presence in Minnesota, and ensure that a substantial portion of the proceeds go to charitable purposes. Minn. Stat. § 349.16, subd. 1; Minn. Stat. § 349.15, subd. 1; Minn. Stat. § 349.12, subd. 25(a).

An organization that seeks to operate within this narrow exception must do so under the scrutiny of the Minnesota Gambling Control Board, which has issued numerous minute regulations to which any lawful gambling operation must conform. *See* Minn. Admin. Code §§ 7861.0210 *et seq*. The Gambling Control Board specifies how many times paddlewheels must spin, how long to store raffle tickets, and where

gambling profits must be deposited. Minn. Admin. Code § 7861.0300, subpart (1)(E); Minn. Admin. Code § 7861.0310, subpart 11; Minn. Admin. Code § 7861.0220, subpart 2(B). Any lawful gambling must be conducted on a cash-only basis and only while the licensed gambling premises are open for regular business. Minn. Admin. Code § 7861.0260, subpart (1)(B), (H).

### B. Stake operates an unregulated, unlicensed, for-profit virtual casino in Minnesota.

Defendant-Appellant Sweepsteaks Limited is a Cyprus-based company that operates the website "Stake.us" in this country. App. 2; R. Doc. 1, at 2. Stake is a virtual casino. App. 1; R. Doc. 1, at 1. Users can play a wide array of virtual games of chance, including blackjack, virtual scratch tickets, even "Rock, Paper, Scissors." App. 5–7; R. Doc. 1, at 5–7. For example, here's Stake's virtual blackjack game:



App. 6; R. Doc. 1, at 6.

Stake users gamble on these games of chance using a virtual currency called "Stake Cash." App. 7–8; R. Doc. 1, at 7–8. Stake provides users with "Stake Cash" at a rate of almost exactly one Stake Cash for each $1 a user pays to Stake. App. 7; R. Doc. 1, at 7; App. 12; R. Doc. 1, at 12. For example, a user who pays Stake $20 would receive 20.05 Stake Cash; a user who pays Stake $100 would receive 100.25 Stake Cash, and so forth. App. 12; R. Doc. 1, at 12. Users gamble with their Stake Cash much as they would poker chips in a brick-and-mortar casino. App. 8; R. Doc. 1, at 8; App. 12; R. Doc. 1, at 12. And when they are done, they can redeem Stake Cash for cryptocurrency "at an implied rate of 1 Stake Cash per 1 USD." App. 7; R. Doc. 1, at 7 (quoting Stake's Terms and Conditions).[1] Any cryptocurrency they receive at that point can be readily converted to U.S. dollars. App. 7; R. Doc. 1, at 7. Gambling a dollar of "Stake Cash" on one of Stake's games is therefore functionally equivalent to gambling an actual U.S. dollar.

Stake publishes Terms and Conditions that it expects users to assent to before playing its games. App. 52; R. Doc. 15, at 3. Among other things, those Terms require users to create and maintain an account with Stake, spell out how "Stake

[1] In addition to cryptocurrency, the August 15, 2025, version of the Terms also allows users to sometimes redeem Stake Cash for fiat currency. App. 141; R. Doc. 16-3, at 23.

Cash" works, and set other rules and conditions to play its games. *See generally* App. 95–106; R. Doc. 16-2, at 8–19. As discussed in more detail below, the Terms also include broad arbitration provisions, including language delegating threshold questions about a dispute's arbitrability to an arbitrator. Users are told that they agree to arbitrate with Stake "[b]y agreeing to these Terms and Conditions." App. 114–16; R. Doc. 16-2, at 27–29.[2]

Stake isn't naïve; it knows that in some U.S. states its services constitute illegal (and potentially criminal) gambling. To mitigate that legal risk, its Terms and Conditions prominently state that Stake is unwilling to transact with users in any such jurisdiction. App. 89–91; R. Doc. 16-2, at 2–4. For example, as the May 2023 Terms put it (in all caps): "IF YOU LIVE IN ANY OF THE EXCLUDED TERRITORIES AS DEFINED BELOW, DO NOT PROCEED ANY FURTHER – YOU ARE NOT ELIGIBLE TO ACCESS OR USE THE PLATFORM, CREATE A CUSTOMER ACCOUNT, PLAY THE GAMES, OR INTERACT WITH STAKE.US IN ANY OTHER WAY." App. 89; R. Doc. 16-2, at 2. "Excluded Territories" is defined to include several named states—Minnesota not among them during the relevant period—and, as a catchall, "other states and jurisdictions which, under the laws applicable to you, are [sic] legally precluded from playing the Games

[2] Except where otherwise noted, this brief cites to the May 2023 Terms, which are the last version that Stake says Mr. Wolters affirmatively assented to.

offered on the Platform." App. 90; R. Doc. 16-2, at 3; *see* App. 122–23; R. Doc. 16-3, at 4–5 (most recent Terms in the record, listing 17 states but not Minnesota).

Stake reserves the right to make "binding" changes to the Terms "at any time," "effective immediately," without prior notice to users. App. 117; R. Doc. 16-2, at 30.

### C. Mr. Wolters lost tens of thousands of dollars compulsively gambling with Stake.

Plaintiff-Appellee Chris Wolters is a recovering gambling addict who suffered dire personal and financial consequences after becoming hooked on Stake's product. App. 16; R. Doc. 1, at 16.

Mr. Wolters' gambling habit spiraled out of control quickly while using Stake. Unlike the few lawful, licensed gambling establishments in Minnesota, Stake doesn't comply with requirements to accept only cash transactions and operate only during regular business hours. *See* Minn. Admin. Code § 7861.0260, subpart (1)(B), (H). Instead, Stake's virtual casino is available 24 hours a day, 7 days a week right in Mr. Wolters's pocket. *See* App. 14–16; R. Doc. 1, at 14–16. That meant Mr. Wolters was able to regularly gamble up to 18 hours a day, and he used an "autobet" setting to gamble automatically while he was at work. App. 15; R. Doc. 1, at 15. He could go on "gambling binges on Stake for over 24 hours at a time, using any money or credit he could access to acquire Stake Cash." App. 16; R. Doc. 1, at 16. Between April 2023 and February 2025, Mr. Wolters spent more than $80,000 gambling on

Stake's website and ran up such formidable debts that he lost his house, his car, and even his pets. App. 14; R. Doc. 1, at 14; App. 16; R. Doc. 1, at 16.

## II. Procedural Background

Mr. Wolters sued Stake on behalf of himself and a putative class of other Minnesota consumers. He asserted claims for multiple violations of Minnesota's consumer protection statutes, for unjust enrichment, and under a statute that allows suits to recover unlawful gambling losses. App. 19–24; R. Doc. 1, at 19–24; *see* Minn. Stat. § 541.20 (recovery of gambling losses). None of Mr. Wolters's claims arises out of any contract between him and Stake.

Stake moved to compel arbitration. App. 27–48; R. Doc. 14, at 1–23; App. 332. It contended that Mr. Wolters had formed a contract with Stake by accepting its Terms and Conditions—either when he first created an account in November 2022, or else in May 2023 while he was compulsively gambling on the site—and that the Terms contained a broad arbitration provision that covered Mr. Wolters's claims. App. 36–40; R. Doc. 14, at 10–14. It also asserted that language in the arbitration provision delegates threshold questions about whether the arbitration clause can be enforced to the arbitrator to decide in the first instance. App. 42–43; R. Doc. 14, at 16–17.

Stake relied on two arbitration paragraphs that are reproduced on pages 4–5 of Stake's opening brief. *See* App. 114–16; R. Doc. 16-2, at 27–29. One says in

relevant part that "By agreeing to these Terms and Conditions, you agree that [a broad range of potential types of disputes] . . . will be governed by the procedure set out below." Opening Br. 4–5; App. 83; R. Doc. 16-1, at 27. The other says that "By agreeing to these Terms and Conditions, both you and Stake agree that any and all Disputes [broadly defined to include questions of arbitrability] … shall be referred to and finally resolved by arbitration … ." Opening Br. 4; App. 84; R. Doc. 16-1, at 84. In both cases, "agreeing to these Terms and Conditions" is the designated way that users enter into the arbitration agreement with Stake.

Stake supported its motion by attaching a declaration from one of its executives, Edward Craven. App. 50–54; R. Doc. 15, at 1–5. Mr. Craven in turn attached several versions of its Terms and Conditions that were in effect between 2022 and 2025, App. 53–54; R. Doc. 15, at 4–5, as well as a partial screenshot of a database that says "Terms of Service," along with "created" and "accepted" dates in May 2023 and a yellow tag that says "Status outdated," App. 56; R. Doc. 16, at 2. Mr. Craven's declaration stated that Mr. Wolters would have had to check a box indicating his acceptance of Terms and Conditions when creating an account in November 2022 and again when prompted to agree to updated Terms in May 2023. App. 51–52; R. Doc. 15, at 2–3. But, as discussed in more detail below, Mr. Craven said almost nothing about the design or appearance of the web interfaces that Mr. Wolters would have seen on either occasion, did not describe the context in which

the alleged prompts would have appeared, and did not provide any imagery to show what Mr. Wolters actually would have experienced. *Id.*; *see infra*, Part IV.

Mr. Wolters opposed the motion. Primarily, he argued that he could not have agreed to arbitrate with Stake. He reasoned that any contract for illegal gambling is void ab initio and therefore cannot be formed under Minnesota law, and that the arbitration terms (including the part delegating issues of arbitrability to the arbitrator) were expressly conditioned on the viability of the broader agreement, making them also void. App. 238–52; R. Doc. 17, at 10–24. In the alternative, he also argued that the agreement was unconscionable and illusory, App. 252–63; R. Doc. 17, at 24–35, and that the bare-bones Craven Declaration was insufficient to demonstrate that he had manifested assent to Stake's Terms, App. 263–66; R. Doc. 17, at 25–38.

The district court denied Stake's motion on two independent grounds.

First, it agreed with Mr. Wolters that under Minnesota law an illegal gambling contract is void, and that therefore no agreement to arbitrate had been formed for Stake to enforce. Add. 6–13; Appellee's App. 6–13; R. Doc. 26, at 6–13. While so holding, the district court noted that Stake "failed to present any argument addressing the substance of Wolters's contention that the Terms and Conditions are an illegal contract because they violate Minnesota's gambling statutes." Add. 12; Appellee's App. 12; R. Doc. 26, at 12.

Second, in the alternative, the district court also agreed with Mr. Wolters that Stake had not met its burden to prove as a matter of law that Mr. Wolters assented to the Terms, and that therefore there were remaining disputes of material fact that required a trial to determine whether meaningful assent had actually been given. Add. 13–15; Appellee's App. 13–15; R. Doc. 26, at 13–15. The district court did not address Mr. Wolters's arguments based on unconscionability and illusoriness. Add. 6; Appellee's App. 6; R. Doc. 26, at 6.

## SUMMARY OF THE ARGUMENT

**I.** This Court must first decide whether any contract exists between Mr. Wolters and Stake. That question of contract formation is always for a court to resolve, even if the purported contract contains an arbitration agreement with a delegation clause, because arbitration is a matter of contract and if the broader contract doesn't exist then neither do any arbitration agreements contained therein. Only if the Court determines that a contract exists will the severability principle come into play and require Mr. Wolters to specifically challenge the enforceability of the arbitration agreement and its delegation clause.

**II.** No contract was or could be formed here. Contract formation is a question of state law—here, Minnesota's—and Stake bears the burden to prove the existence of a contract. Stake has failed to carry its burden to show that any contract was formed here for several interrelated reasons.

**A.** Stake doesn't contest that it offers illegal gambling, and an illegal gambling contract is void ab initio under Minnesota law. That means that it never had any legal existence or binding force. And contrary to Stake's assertions, that argument goes to whether any contract was formed in the first place, not whether the contract is valid, so severability doesn't apply.

**B.** Stake's own contract reinforces that conclusion. Stake, as the master of its offer, gets to decide who may accept. And Stake's Terms and Conditions disavow any willingness to transact with users in states where its services are illegal. That means that Mr. Wolters and other Minnesotans have never been eligible to enter into this illegal contract with Stake and could not have formed a binding agreement with the company.

**C.** Stake's end of the bargain is also illusory and cannot constitute proper consideration, for much the same reason just described: Because Stake's service is illegal in Minnesota, the company is unwilling to transact with users there, and its Terms accordingly advise that Stake will not honor any of its ostensible commitments to them. Not only that, but Stake's promises are illusory for an additional reason: It reserves the right to amend the contract at any time, without advance notice and effective immediately. With only illusory consideration on Stake's side of the bargain, no binding contract was ever formed.

**III.** Even if those problems were not fatal to the existence of a contract, they are also reasons why the arbitration agreement and delegation clause are unenforceable here. As the severability principle requires, Mr. Wolters specifically challenged both the arbitration agreement and the delegation clause in the district court, on grounds that apply equally to both, so those challenges must be resolved by a court before compelling arbitration. And here the arbitration agreement and delegation clause are both unenforceable for two reasons: (1) they are conditioned on "agreeing to" Stake's illegal Terms and Conditions, so they are themselves void as illegal contracts, and (2) both are illusory for the same reason as the broader contract, namely that Stake can amend them at any time, effective immediately.

**IV.** Even setting all that aside, Stake hasn't carried its burden to show that Mr. Wolters ever assented to its Terms. Stake supported its motion with little more than a bare-bones declaration that omits essential details and leaves important questions unanswered about how Stake presented its Terms to Mr. Wolters. In light of the fact-intensive nature of this issue, and the summary judgment-like standard that applies at this stage, the district court was right to hold that it cannot find mutual assent as a matter of law and to require further factual development.

**V.** If this Court reverses, Mr. Wolters's remaining unconscionability and illusoriness challenges to the arbitration agreement and delegation clause should be remanded for the district court to address in the first instance.



Appellate Case: 26-2459 Page: 24 Date Filed: 11/13/2026 Entry ID: 5705992

## STANDARD OF REVIEW

An appellate court "review[s] a district court's denial of a motion to compel arbitration *de novo* and its factual findings for clear error." *Schlacks v. Chheda*, 174 F.4th 1061, 1066 (8th Cir. 2026).

## ARGUMENT

### I. The Court must first decide whether a contract exists before deciding whether an arbitration provision—including a delegation clause—is otherwise enforceable.

The Court must start by deciding whether a contract exists between Mr. Wolters and Stake. The FAA allows courts to compel arbitration only "upon being satisfied that the making of the agreement for arbitration ... is not in issue." 9 U.S.C. § 4. Accordingly, a court must decide any formation challenge before compelling arbitration. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296–97 (2010). Such a challenge could be to only the arbitration provision itself, but, more commonly, parties challenge the formation of the entire contract of which the arbitration provision is a part. That's because a challenge to the formation of the contract containing the arbitration provision "necessarily puts the 'making' of any arbitration provision within that contract at issue." *Johnson v. Cont'l Fin. Co.,* 131 F.4th 169, 175 (4th Cir. 2025). Thus, "[i]t would defy the plain text of the FAA to enforce an arbitration clause without first determining that the contract in which it is contained was properly formed." *Id.*

For example, *Schlacks v. Chheda*, 174 F.4th 1061, 1066 (8th Cir. 2026), involved a partnership agreement that contained an arbitration provision. The parties disputed whether they had formed an arbitration agreement with each other because the plaintiffs had not signed the partnership agreement. *Id.* This Court held that "a court must determine whether a valid arbitration agreement exists" and then concluded that, because the plaintiffs were not parties to the partnership agreement, they had not formed an arbitration agreement with the defendants. *Id.* In other words, the arbitration agreement didn't exist because no partnership agreement existed between them.

This rule "reflects the fundamental principle that arbitration is a matter of contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147 (2024) (citation modified). If no contract exists in the first place, the court lacks authority to enforce any part of that contract, including the arbitration provision or a clause within the arbitration provision delegating issues of arbitrability to the arbitrator. As a result, the court cannot compel arbitration of either the merits or arbitrability "unless a valid contract exists between the parties." *Schlacks*, 174 F.4th at 1066.

Stake resists this straightforward rule by invoking the "severability principle" articulated by the Supreme Court in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967), and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). The severability principle provides that "as a matter

of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract," so "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye*, 546 U.S. at 446, 449. The plaintiff in *Buckeye* argued that an otherwise-lawful contract (a garden-variety consumer loan agreement) contained one illegal provision (an allegedly usurious interest rate), and that one illegal provision "render[ed] the whole contract invalid." *Id.* at 444. The Supreme Court held that the challenge to the illegal interest rate must go to the arbitrator because it was not specifically directed at the arbitration agreement. *Id.* at 446. Later, in *Rent-A-Center West v. Jackson*, the Supreme Court applied the severability principle to a delegation clause, finding that, because the plaintiff challenged the unconscionability of the entire arbitration agreement, rather than the delegation clause specifically, his challenge must be decided by an arbitrator. 561 U.S. 63, 70–75 (2010),

But the Supreme Court was careful to note in both *Buckeye* and *Rent-A-Center* that the severability principle applies only to questions of the "validity" of the contract, not the threshold question whether any agreement "was ever concluded." *Buckeye*, 546 U.S. at 444 n.1; *Rent-A-Center*, 561 U.S. at 70 n.2. And in *Koch v. Compucredit Corp.*, 543 F.3d 460, 464–65 (8th Cir. 2008), this Court rejected the argument that *Buckeye* required the court to delegate a question about formation of the entire agreement, explaining that *Buckeye*'s severability holding applied only to



Appellate Case: 26-2459 Page: 27 Date Filed: 11/13/2026 Entry ID: 5705992

questions of validity. The Supreme Court has since confirmed that the formation question remains for a court to decide. *See Granite Rock*, 561 U.S. at 296–97. Applying those cases, courts of appeals have held that a court must decide "any formation challenge to the contract containing the arbitration clause, in keeping with *Granite Rock*," before applying the severability principle to the arbitration provision or delegation clause. *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th Cir. 2012); *see Johnson*, 131 F.4th at 175–77 (holding that a court, not an arbitrator, decides whether a contract containing an arbitration provision and a delegation clause was ever formed); *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105-6 (10th Cir. 2020) ("a delegation clause cannot be severed from an agreement that does not exist"); *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 402 (3d Cir. 2020) (collecting, and agreeing with, additional cases holding that "courts retain the primary power to decide questions of whether the parties mutually assented to a contract containing or incorporating a delegation provision"). As the Fourth Circuit emphasized, the fact that the severability principle applies to questions of validity but not formation "is underscored by common sense." *Johnson*, 131 F.4th at 177. "[A] claim that a contract is *invalid* presupposes the existence of a contract but maintains that it should not be enforced." *Id.* Thus, a court can sever specific provisions of the contract and decline to enforce those while the rest of the agreement remains in force. *Id.* But "if

a contract was never formed, there is no agreement from which any provision, including an arbitration clause, can be severed." *Id*.

Here, then, the Court's analysis must proceed in two steps. *See Solymar*, 672 F.3d at 990 (describing this "two-step process"). *First,* it must decide whether any contract was formed between Mr. Wolters and Stake. If no contract exists at all, neither the arbitration provision nor the delegation clause can be enforced. *Second,* if—and only if—the Court determines that a contract exists, the severability principle dictates that it consider any specific challenges to the validity of the severable contractual provisions, starting with the delegation clause. *See Schlacks*, 174 F.4th at 1066–67.[3] If the delegation clause is invalid, the court must address any specific challenges to the arbitration agreement before compelling arbitration. *See Buckeye*, 546 U.S. at 445–46.

## II. Stake cannot compel arbitration because no contract was ever formed between the parties.

No agreement was or could be formed between Stake and Mr. Wolters here. "The party seeking to compel arbitration bears the burden of proving the existence of a valid contract that binds the parties to arbitrate their dispute." *Schlacks*, 174 F.4th at 1066 (citation modified). Whether a contract exists is a question of state

[3] Stake has asserted that its contract contains such a delegation provision, and Mr. Wolters does not dispute that reading of the contract for purposes of this appeal.

contract law, *id.*, and the parties agree that Minnesota law governs, *see* Opening Br. 11 (citing *Asia Pac. Indus. Corp. v. Rainforest Café, Inc.*, 380 F.3d 383, 385 (8th Cir. 2004)). In Minnesota, as in other jurisdictions, "[a] contract is formed when two or more parties exchange bargained-for promises, manifest mutual assent to the exchange, and support their promises with consideration." *In re Disciplinary Action Against Riehm*, 883 N.W.2d 223, 230 (Minn. 2016) (citing Restatement (Second) of Contracts § 17 (1981)).

Here, no contract has been formed because: (A) Minnesota law precludes formation of any contract for Stake's illegal gambling services; (B) Stake's own contract confirms as much by refusing to transact with users in jurisdictions where doing so would be illegal; and (C), Stake has made only illusory commitments to Mr. Wolters that cannot constitute consideration under Minnesota law.

### A. No contract was formed because an illegal gambling contract is void under Minnesota law.

The district court correctly held that Stake had not met its burden of proving the existence of a contract because the contract it relies on was entered into in violation of Minnesota's gambling statutes and is therefore void. *See* Add. 13; Appellee's App. 13; R. Doc. 26, at 13.

Operating a gambling website like Stake.us is illegal in Minnesota. As noted above, Minnesota law makes it a crime to "set[] up for use for the purpose of

gambling, or collect[] the proceeds of, any gambling device," and to "receive[], record[], or forward[] bets or offers to bet." Minn. Stat. § 609.76, subd. 1(4), (7). There is an exception to those prohibitions for "fraternal, religious, veterans, or other nonprofit organizations," but, as to those entities, Minnesota has a strict licensing and regulatory regime. Minn. Stat. §§ 349.155, 349.16. In general, "Minnesota's statutory scheme limits the commercial operation of video games of chance and other gambling devices to federally recognized tribes with tribal-state compacts." *In re Running Aces Casino*, 30 N.W.3d 285, 291 (Minn. 2026). Stake violated those laws when, as a for-profit company and without any license, it enabled Mr. Wolters and other Minnesotans to bet by purchasing "Stake cash," which they could gamble with on Stake's platform and then redeem for cryptocurrency (and thus ultimately cash). App. 5–11; R. Doc. 1 at 5–11; App. 67–73; R. Doc. 16-1, at 11–17.

Under Minnesota law, "the general rule is that a contract entered into in violation of a statute which imposes a prohibition and a penalty for the doing of an act, such as the pursuit of a business, profession, or occupation without procuring a license or permit required by law for the protection of the public, is void." *Lew Bonn Co. v. Herman*, 135 N.W.2d 222, 225 (Minn. 1965); *see also, e.g.*, *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 725 N.W.2d 90, 94 (Minn. 2006) ("[E]ntering into a contract in violation of a statute generally voids the contract[.]"). And the Minnesota legislature has by statute applied this general principle specifically to unlawful

gambling contracts: In Minnesota, a "contract or conveyance" "in which the whole or any part of the consideration shall be for money or goods won by gambling … *shall be void and of no effect* as between the parties to the same." Minn. Stat. § 541.21 (emphasis added). Thus, because the contract here is for Stake to provide services that are illegal under Minnesota's gambling statutes, it is "void and of no effect." *Id.*

As the district court pointed out, Stake did not dispute the illegality of its contract below. *See* Add. 12; Appellee's App. 12; R. Doc. 26, at 12 ("Stake has failed to present any argument addressing the substance of Wolter's contention that the Terms and Conditions are an illegal contract because they violate Minnesota's gambling statutes."). Nor does it do so on appeal. Thus, it has forfeited any argument that the contract here is not illegal. Instead, Stake contends that, even if the contract is void, that goes to the "validity" of the contract rather than "whether any agreement between the parties was ever concluded," and thus an arbitrator—not a court—must decide whether the contract is illegal. Opening Br. 14 (quoting *Rent-A-Center*, 561 U.S. at 70 n.2). The district court was correct not to accept that argument.

As the Minnesota Supreme Court has long explained, a "void" contract is one that "never had any legal existence or binding force." *Cooper v. Finke*, 38 Minn. 2, 7, 35 N.W. 469, 471 (Minn. 1887). In Minnesota, "void" means "null" or "of no legal effect." *In re Stevens Cnty. for a Conditional Use Permit*, 2023 WL 5696623,

at *8 (Minn. Ct. App. Sept. 5, 2023). That means that, for example, the doctrine of rescission cannot apply to a void contract because "there was no contract" to begin with. *Zurn v. Zurn*, 2025 WL 301176, at *6 n.8 (Minn. Ct. App. 2025) (quoting *Todd v. Bettingen*, 124 N.W. 443, 445-46 (Minn. 1910)). In other words, a "void contract" is "[a] contract that is of no legal effect, so that there is really no contract in existence at all." Void, Black's Law Dictionary (12th ed. 2024); *accord Day v. Case Credit Corp.*, 427 F.3d 1148, 1153 (8th Cir. 2005) (contracts "were void from their inception" and thus "nonexistent"). For that reason, Minnesota courts have held, contrary to Stake's argument here, that a court must address the question of whether an agreement is void before compelling arbitration under that agreement. *See Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 354 (Minn. 2003); *Heintz v. Cambridge Inv. Rsch., Inc.*, 2019 WL 6461312, at *3 (Minn. Ct. App. Dec. 2, 2019).

Though Stake makes the conclusory statement that whether the terms are void for illegality "is quite clearly a dispute regarding the 'validity' and 'enforceability'" of the contract, Opening Br. 14, it does not grapple with Minnesota law on this point. Nor does Stake otherwise explain why the district court was wrong to conclude that, because the Terms were illegal under Minnesota law, that meant they were not just invalid or unenforceable but "nonexistent." *See* Add. 13; Appellee's App. 13; R. Doc. 26, at 13. This Court has been very clear that state law, not federal law, governs

the initial question of whether a contract has been formed. *Schlacks*, 174 F.4th at 1066. Yet Stake has not identified any support for its position in Minnesota law.

Instead, Stake relies exclusively on this Court's decision in *Benchmark Ins. Co. v. SUNZ Ins. Sols. Co.*, 36 F.4th 766, 772 (8th Cir. 2022), contending that *Benchmark* "applies equally" here. Opening Br. 14–15. But *Benchmark* says nothing about whether a void-for-illegality challenge in Minnesota goes to a contract's existence or its validity, which is the question here. *Benchmark* held that the question of whether a later contract superseded a contract with an arbitration provision, thus rendering the earlier contract "void," was "a challenge to the [earlier] contract's validity, that, under *Buckeye*, shall be considered by an arbitrator, not a court." *Id.* at 772. But that holding has since been rejected by the Supreme Court. After *Benchmark* was decided, the Court made clear in *Suski* that the question at issue in *Benchmark*—whether a later contract supersedes an earlier contract—is about "whether there is an agreement to arbitrate," not the contract's validity. 602 U.S. at 150 (quoting *Field Intel. Inc. v. Xylem Dewatering Sols. Inc.*, 49 F.4th at 351, 356 (3d Cir. 2022)). "[A]nd, per usual, *that* question must be answered by a court," even when there is a delegation clause. *Id.* Thus, to the extent Stake cites *Benchmark* for the general proposition that whether a contract is "void" always goes to its "validity," any such holding cannot have survived *Suski*.



Appellate Case: 26-2459 Page: 34 Date Filed: 11/13/2026 Entry ID: 5705992

Unlike *Benchmark*, *Buckeye* itself did concern a void-for-illegality challenge. But *Buckeye* didn't hold that a void-for-illegality challenge *always* goes to validity rather than contract formation; that is just how it understood the specific Florida-law voidness challenge it had before it. *See* 546 U.S. at 444 (looking to "the crux of the complaint" in that case). Moreover, the challenge there was different from Mr. Wolters' in crucial respects. It was brought under Florida law, not Minnesota law. *Id.* at 443. The plaintiff there argued that "the illegality of one of the contract's provisions render[ed] the whole contract invalid," *id.* at 444, but here Mr. Wolters argues that the *entire* contract, not just one provision, is illegal, *see Isles Wellness*, 725 N.W.2d at 95 (explaining that an entire contract is "void" when "illegality has so tainted the transaction"). And he asserts that, under Minnesota law, the illegal subject matter did not just render the contract "invalid" but precludes the existence of a contract in the first place. In any event, *Buckeye* was about severability and whether *validity* challenges need to be directed specifically to the arbitration clause; it didn't address formation challenges. 546 U.S. at 444; *see Koch*, 543 F.3d at 464–65 (distinguishing *Buckeye* on this ground); *Johnson*, 131 F.4th at 176–77 (same).[4]

[4] And as explained in Part III, *infra*, even assuming that Mr. Wolters's Minnesota-law arguments could be construed as challenges to validity rather than formation, Mr. Wolters—unlike the plaintiffs in *Buckeye*—does specifically challenge the arbitration provisions as well.



Appellate Case: 26-2459 Page: 35 Date Filed: 11/13/2026 Entry ID: 5705992

### B. Stake's Terms and Conditions confirm that the contract's illegality is a formation problem.

Even if illegality could *sometimes* be a problem of validity rather than formation, applying Minnesota law to Stake's own Terms and Conditions confirms that no illegal contract could have been formed with Mr. Wolters here. The Terms and Conditions make explicit that Stake's offer to contract extends only to people in jurisdictions where the company can legally operate.

It is black-letter contract law that "[a]n offer can be accepted only by a person whom it invites to furnish the consideration." Restatement (Second) of Contracts § 52 (1981). Minnesota law, like the law of other states, has long recognized this power to limit *who* is eligible accept a contract offer. In Minnesota, "a person has a right to determine for himself with whom he will enter into contractual relations." *Everson v. J. L. Owens Mfg. Co.*, 176 N.W. 505, 507 (Minn. 1920). That means that no legally recognized contract can be formed "with a party with whom he never intended to contract." *Id.*; *see also Jorgensen Chevrolet Co. v. First Nat. Bank of Red Wing*, 14 N.W.2d 618, 622–23 (Minn. 1940) (collecting cases). This hoary principle of contract law is an instance of the maxim that "the offeror is the master of his offer." *Blackford v. Prairie Meadows Racetrack and Casino, Inc.*, 778 N.W.2d 184, 190 (Iowa 2010) (quoting Restatement (Second) of Contracts § 29, cmt. a, at 83).



Appellate Case: 26-2459 Page: 36 Date Filed: 11/13/2026 Entry ID: 5705992

As the master of its own offer, Stake's Terms make explicit with whom the company is willing to contract, and with whom it isn't. In the May 2023 version of the Terms, Stake's contract says that people in "Excluded Territories" are "NOT ELIGIBLE TO ACCESS OR USE THE PLATFORM, CREATE A CUSTOMER ACCOUNT, PLAY THE GAMES, OR INTERACT WITH STAKE.US IN ANY OTHER WAY." App. 89; R. Doc. 16-2, at 2. "Excluded Territories" is defined to include "[a]ny … states or jurisdictions which, under the laws applicable to you, are legally precluded [sic] from playing the Games offered on the Platform." App. 90; R. Doc. 16-2, at 3. Anyone who lives in such a state is instructed in all caps on the first page of the contract to "NOT PROCEED ANY FURTHER." App. 89; R. Doc. 16-2, at 2. And if that weren't clear enough about Stake's unwillingness to contract in those states, the Terms then reiterate that anyone in an excluded jurisdiction should not "CHECK THE BOX FOR ACCEPTANCE OF THESE TERMS," and that doing so would be in "VIOLATION OF THESE TERMS AND CONDITIONS." App.89–90; R. Doc. 16-2, at 3. All of this sends a clear message: Stake's offer of gambling services is inapplicable in states where those services are



Appellate Case: 26-2459 Page: 37 Date Filed: 11/13/2026 Entry ID: 5705992

illegal, and anyone in such a state is not eligible to accept the Terms or form a contract with Stake.[5]

And for good reason. Absent narrow exceptions that plainly do not apply to Stake, it is a crime in Minnesota to operate a gambling device and to accept bets or offers to bet. *See* Minn. Stat. § 609.76, subd. 1(4), (7). Moreover, as explained above, Minnesota law would render Stake's terms "void and of no effect" even if the company tried to contract there. *See supra*, Part II.A. No wonder Stake's lawyers took pains to ensure its Terms couldn't be read to do something that would be ineffectual at best, and potentially criminal at worst, even while the company led unsuspecting Minnesota residents like Mr. Wolters to believe mistakenly that its services were legal in the state.

Because Stake's services are illegal under Minnesota law, and Stake wasn't willing to contract where its services are illegal, Mr. Wolters was not eligible to accept Stake's offer. He therefore could not have formed a contract with the

[5] This exact language is used in two of the three versions of the terms that Stake.us says apply to Mr. Wolters. *See* App. 122–23; R. Doc. 16-3, at 4-5 (August 2025 Terms); App. 89-90; R. Doc. 16-2, at 2-3 (May 2023 Terms). In the earliest version, the wording of some of these provisions differs immaterially, and appears in different places on the first two pages of the contract. *See* App. 58–59; R. Doc. 16-1, at 2-3 (November 2022 Terms). But the upshot is the same: Stake.us's offer does not extend to people in jurisdictions where its business is illegal.



Appellate Case: 26-2459 Page: 38 Date Filed: 11/13/2026 Entry ID: 5705992

company. *See Everson*, 176 N.W. at 507; *Jorgensen Chevrolet Co.*, 14 N.W.2d at 622–23.

The facts here bear striking similarity to *Blackford v. Prairie Meadows Racetrack and Casino*, where the Iowa Supreme Court court found that no contract existed. 778 N.W.2d at 190. In *Blackford*, a patron was banned in writing from entering casino premises but nevertheless joined the casino's "Slot Club" and won a jackpot there. *Id.* at 186–87. The casino confiscated the jackpot, and the patron sued to get it back. *Id.* at 187. The case hinged on a straightforward legal question: Did the patron's choice to gamble there against the casino's express wishes give rise to a "legally binding contract" between them, as it would have with a welcomed customer? *Id.* at 188–89. To answer that question, the Iowa Supreme Court applied "traditional contract principles" much like Minnesota's, specifically the doctrine that "the offeror may decide to whom to extend the offer." *Id.* at 189. The casino, it reasoned, gets to "determine the class of individuals to whom the offer is made" and could "exclude certain individuals." *Id.* at 190. Its express, written refusal to do business with the banned patron therefore meant that the casino "had not extended him an offer." *Id.* And "[b]ecause there was no offer to him, no contract could result." *Id.*

So too here. It was up to Stake whether its offer to contract extended to a certain class of individuals, namely people in states where its business was illegal.

It chose to expressly exclude that class of individuals from its offer, and Mr. Wolters was one of those excluded individuals. So "no contract could result." *Id.*; *see Everson*, 176 N.W. at 507; *Jorgensen Chevrolet Co.*, 14 N.W.2d at 622–23.

**C. No contract was formed because Stake failed to promise any non-illusory consideration.**

Even if Mr. Wolters could have accepted Stake's offer, Stake's attempt to form a contract with Mr. Wolters would still fail for want of consideration. The lack of consideration arises here from the express terms of the contract, which disclaim Stake's obligation to provide Mr. Wolters any contractual benefits and reserve to Stake the right to unilaterally modify the contract at any time.

In Minnesota, as elsewhere, "the absence of consideration is fatal to the formation of a contract." *Metro. Transp. Network, Inc. v. Collaborative Student Transp. of Minn., LLC*, 6 N.W.3d 771, 782 (Minn. Ct. App. 2024); *see In re Riehm*, 883 N.W.2d at 230. Consideration requires that "one party to a transaction voluntarily assume an obligation on condition of an act or forbearance by the other party." *In re Riehm*, 883 N.W.2d at 231 (quoting *U.S. Sprint Commc'ns Co. v. Comm'r of Revenue*, 578 N.W.2d 752, 754 (Minn. 1998)).

Here, Stake's promises to Mr. Wolters and other users in Minnesota are illusory and therefore cannot constitute proper consideration. *See Grouse v. Grp. Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981); *Serv. Restoration, Inc. v.*



Appellate Case: 26-2459 Page: 40 Date Filed: 11/13/2026 Entry ID: 5705992

*Evanston Ins. Co.*, No. 24-cv-938, 2025 WL 3228210, at *13 (D. Minn. Nov. 19, 2025) (collecting authorities). "An illusory promise is a promise in form that promises nothing." *Serv. Restoration*, 2025 WL 3228210, at *13 (quoting *Nielsen v. Grain Millers, Inc.*, No. 16-cv-3103, 2017 WL 11569190, at *4 (D. Minn. May 2, 2017) (citing *Anderson v. Backlund*, 199 N.W. 90, 91 (Minn. 1924))).

Of course, Stake's Terms spell out and set the ground rules for its provision of a gambling platform and related services to its users that—if legal—would presumably constitute run-of-the-mill consideration. But for users in jurisdictions where Stake's business is illegal, like Minnesota, Stake's Terms give with one hand and take away with the other. As explained above, Stake's Terms make clear (in all caps) that people in any jurisdiction where Stake's business is illegal "ARE NOT ELIGIBLE TO ACCESS OR USE THE PLATFORM, CREATE A CUSTOMER ACCOUNT, PLAY THE GAMES, OR INTERACT WITH STAKE.US IN ANY OTHER WAY." App. 89; R. Doc. 16-2, at 2; *see supra*, Part II.B. So the contract's plain text establishes that Mr. Wolters and other Minnesotans are not entitled to the benefits that the contract otherwise purports to confer, and that Stake owes no obligations to them. Those benefits and obligations, then, cannot constitute consideration, because Stake has not "committed to performance" in Minnesota. *Grouse*, 306 N.W.2d at 116; *see Estate of Peterson*, 579 N.W.2d 488, 492 (Minn. Ct. App. 1998) (a benefit is not "consideration for a contract if the parties did not

voluntarily agree that it would be consideration"); *In re Welfare of D.D.G.*, 553 N.W.2d 86, 90 (Minn. Ct. App. 1996), *rev'd on other grounds*, 558 N.W.2d 481 (Minn. 1997) (a contractual term is "illusory" if a counterparty has "no standing to enforce" them).

And Stake's ostensible commitments are also illusory in another respect: The contract permits Stake to amend the contract "at any time," "effective immediately." App. 117; R. Doc. 16-2, at 30. In practical effect, that means Stake has ensured that it can always change any term of the contract that it wants, at any time. This is yet further evidence that Stake never "committed to performance" of its obligations under the contract. *Grouse*, 306 N.W.2d at 116. And that means that Stake's ostensible promises are not proper consideration: "When one side can avoid all of its obligations, the agreement lacks the kind of basic reciprocity that is necessary to form a binding contract." *Johnson*, 131 F.4th at 178 (Maryland law). And "[i]t is rudimentary contract law that an agreement lacks consideration, and is therefore never formed, when it consists entirely of illusory promises." *Id.*; *see also Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 36–37 (8th Cir. 1975) (Missouri law; explaining that an agreement is "illusory" due to "a complete failure of consideration" when one party "retain[s] the right of immediate cancellation at any time for any reason").



Appellate Case: 26-2459 Page: 42 Date Filed: 11/13/2026 Entry ID: 5705992

To be sure, it is commonplace and often acceptable for the drafter of a consumer contract to retain the right to modify and update its terms. But companies typically draft these provisions so that changes only take effect after a period of advance notice, during which consumers can choose to discontinue their relationship with the company and thereby avoid becoming bound by the revised terms. For example, in *Donelson v. Ameriprise Financial Services, Inc.*, 999 F.3d 1080 (8th Cir. 2021), this Court upheld terms and conditions that required 30 days advance notice of changes, during which time the consumer could discontinue use of his account to avoid becoming bound. *Id.* at 1090–91; *see also Nelson v. Watch House Int'l, LLC*, 815 F.3d 190, 194 (5th Cir. 2016) (collecting other examples). Here, Stake chose not to place any such limits on its discretion: It went out of its way to specify that it has the "right" to make changes "at any time" and that those changes will be "binding and effective immediately." App. 117; R. Doc. 16-2, at 30.[6]

[6] To be sure, the contract also says "If you do not agree to the amended Terms and Conditions, you must stop using the platform." App. 117; R. Doc. 16-2, at 30. But any implication that a user could theoretically opt out of Stake's unilateral changes is yet another illusory promise: Any change becomes "binding … effective immediately" upon adoption. *Id*. And Stake commits to publishing amended terms only "on the Platform," rather than affirmatively providing notice to its users. *Id*. So by the time a user even becomes aware of a unilateral change—which may never happen, because Stake isn't obliged to provide any notice—that change is already "binding" and the user has already continued "using the platform." *Id.*; *see Johnson*, 131 F.4th at 178.

Illusoriness of this sort is especially glaring when the drafter of a contract has *in fact* exercised its authority to amend the contract unilaterally and without notice, to the other party's detriment. *See Pizza Hazel, Inc. v. Am. Express Co.*, 2025 WL 3023060, at *8 (D. Mass. May 19, 2025), *adopted*, 2025 WL 2682394, at *3-4 (D. Mass. Sept. 19, 2025). Stake appears to have done just that here: In 2024, it amended its arbitration provision, effective immediately, to incorporate a time-sensitive opt-out provision, but (although Mr. Craven avers that Stake notified Mr. Wolters of other updates) there is no evidence that Stake ever notified Mr. Wolters that this change had been made. App. 52–54; R. Doc. 15, at 3–5.

In sum, Stake's Terms are illusory and therefore lack consideration, at least as applied to users in jurisdictions like Minnesota where Stake's business is illegal. That further confirms the district court's conclusion that no contract exists between Stake and Mr. Wolters.[7]

---

[7] Mr. Wolters argued in the district court that Stake's promises were illusory, and that therefore he and Stake could not "meaningfully agree to" Stake's Terms. App. 261; R. Doc. 17, at 33. The district court did not rule on that argument. So this Court could, if it prefers, remand for the district court to address in the first instance whether the contract and/or its arbitration provisions are illusory such that no valid contract was ever formed.

## III. The arbitration agreement and delegation clause, specifically, are invalid and unenforceable.

Even if the Court concludes that the severability principle requires Mr. Wolters's illegality and illusoriness challenges to be specifically directed at the arbitration provision and delegation clause, Mr. Wolters has done that here, as the district court concluded.

To specifically challenge the enforceability of a delegation clause or arbitration provision, "[a] party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, not just the contract as a whole." *Suski*, 602 U.S. at 150–51. But that does not mean that a party must "challenge *only* the arbitration or delegation provision." *Id.* So long as "a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Id.* (quoting *Rent-A-Center*, 561 U.S. at 71). That's because a delegation clause "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Rent-A-Center*, 561 U.S. at 70. So, if the delegation clause is unenforceable for any reason—including the same reason as the container contract—the court cannot compel arbitration under it.

In *Suski*, for example, it was enough that the parties resisting arbitration mentioned the delegation clause, stating that "courts can refer the question of arbitrability to an arbitrator only if a valid arbitration agreement exists." 602 U.S. at

151 n.* (quoting their opposition brief) (cleaned up). They then argued that "the parties' prior arbitration agreements," plural, were superseded. *Id.* That was sufficient to specifically challenge the delegation clause at issue. And that was so even though the challenge was based on the exact same grounds that would also nullify the broader contract and arbitration clause: namely, that the contract containing the arbitration provisions had been superseded. *Id.* A unanimous Court in *Suski* contrasted the facts of *Rent-A-Center*, "where the plaintiff 'did not even mention the delegation provision.'" *Id.* (quoting *Rent-A-Center*, 561 U.S. at 71) (cleaned up).[8]

Mr. Wolters specifically challenged both the arbitration agreement and the delegation clause here. Citing the portion of *Rent-A-Center* in which the Supreme Court stated that a delegation clause is itself a "written provision … to settle by arbitration a controversy," 561 U.S. at 71 (quoting 9 U.S.C. § 2), Mr. Wolters stated that he was challenging multiple "written provision[s] … to settle by arbitration a controversy" on the same grounds, App. 239–40; R. Doc. 17, at 12 (quoting *Rent-A-Center*, 561 U.S. at 71) (alteration to plural in Mr. Wolter's brief). He then quoted the exact language that Stake characterizes as a delegation clause (along with the

[8] *Suski* "assum[ed] without deciding that the severability principle [was] implicated" by the challenge there, before holding that the challenge was specific enough to satisfy the principle even if it did apply. 602 U.S. at 150.



Appellate Case: 26-2459 Page: 46 Date Filed: 11/13/2026 Entry ID: 5705992

broader arbitration provision) and said that he "specifically challenges these provisions," plural. *Compare* App. 241; R. Doc. 17, at 13, *with* Opening Br. 4–5. Thus, the court must address his specific challenges to the delegation clause and arbitration agreement before compelling arbitration.[9]

Here, the delegation clause and the arbitration agreement are themselves unenforceable for the same reasons described above as to the entire contract.

First, the arbitration agreement and delegation clause are void as illegal contracts. As the district court explained, the arbitration agreement, including its delegation clause, is "preconditioned on assent to the entire Terms and Conditions." Add. 11; Appellee's App. 11; R. Doc. 26, at 11. The agreement states that, "[b]y agreeing to these Terms and Conditions," Mr. Wolters agrees to arbitrate both the merits and arbitrability of his claims. App. 114–15; R. Doc. 16-2, at 27-28. So, acceptance of the delegation clause—and the arbitration agreement of which it is a

[9] Even had Mr. Wolters not specifically cited the delegation language, his repeated statements that he is challenging multiple arbitration provisions show that his arguments applied equally to the delegation provision. *See* App. 239–40; R. Doc. 17, at 11-12; App. 251; R. Doc. 17, at 23; App. 252; R. Doc. 17, at 24; App. 267; R. Doc. 17, at 39 ("Stake's offers to arbitrate," plural). Stake's broader arbitration clause and the delegation provision contained within it are the only two "written provision[s] … to settle by arbitration a controversy" conceivably at issue here. 9 U.S.C. § 2; *see Rent-A-Center*, 561 U.S. at 71–72. So Mr. Wolters' challenges to multiple "such provisions" must have been directed at both of them. App. 240; R. Doc. 17, at 12; *cf. Suski*, 602 U.S. at 151 n.* (argument directed at "prior arbitration agreements," plural, specifically challenged a delegation provision).

part—is contingent on entering into a contract to gamble. If Mr. Wolters does not agree to gamble, there is no agreement to arbitrate and no agreement to delegate questions of arbitrability to the arbitrator, either. "Accordingly, the arbitration [and delegation] provision itself would constitute a void contract because it is, at least in part, based on illegal gambling consideration." *Macon Cnty. Greyhound Park, Inc. v. Hoffman*, 226 So. 3d 152, 167 (Ala. 2016) (denying a motion to compel arbitration where the agreement to arbitrate was expressly conditioned on participation in illegal gambling).

By way of illustration, imagine that Mr. Wolters sought to enter an illegal casino but, at the door, he was asked to sign an arbitration agreement to enter. Even if the arbitration agreement did not say anything about gambling, it would still be an illegal agreement because its purpose is to allow Mr. Wolters to engage in illegal gambling. The same is true here: The arbitration agreement and delegation clause are each unenforceable standing alone because, like the larger contract, each was entered into to engage in illegal gambling. *See* Minn. Stat. § 541.21; *Lew Bonn Co.*, 135 N.W.2d at 225.

Once again, Stake does not engage with the merits of whether either the arbitration agreement or the delegation clause, like the entire contract, is illegal under Minnesota law. Instead, it again falls back on the severability principle, arguing that the district court should have treated the arbitration agreement and



Appellate Case: 26-2459 Page: 48 Date Filed: 11/13/2026 Entry ID: 5705992

delegation clause as severable from the rest of the agreement under *Buckeye*. But the district court's holding that the arbitration agreement (and delegation clause within it) is itself a void illegal gambling agreement is entirely consistent with the severability principle. *See Macon Cnty. Greyhound Park*, 226 So.3d at 167. Again, the severability principle "does not require that a party challenge *only* the arbitration or delegation provision," and the principle is satisfied if a challenge applies "'equally' to the whole contract and to an arbitration or delegation provision." *Suski*, 602 U.S. at 150–51 (quoting *Rent-A-Center*, 561 U.S. at 71). Here, Mr. Wolters not only argued that the entire contract was illegal but also that the arbitration agreement and delegation clause specifically were unenforceable because they, too, were based on illegally agreeing to gamble. App. 241–43; R. Doc. 17, at 13–15. As a result, a court "must consider the challenge before ordering compliance with" the delegation clause. *Rent-A-Center*, 561 U.S. at 71.

Stake argues that Mr. Wolters' illegality argument should be decided by an arbitrator because the arbitration agreement in *Buckeye* contained somewhat similar language to the agreements here: The contract in *Buckeye* stated that "By signing this Agreement," the parties were agreeing to arbitration, and the court held that the arbitration agreement there was severable from the rest of the agreement. Opening Br. 18. But again, Mr. Wolters does not dispute that, if a contract exists, the delegation clause and arbitration agreement here are severable; he is challenging

them on the basis that, *when severed*, they are unenforceable because, by their plain language, they require agreement to illegal gambling. In *Buckeye*, by contrast, the plaintiffs "challenge[d] the Agreement, and not specifically its arbitration provisions." 546 U.S. at 446. As a result, the Court did not address the "By signing this Agreement" language cited by Stake, because it was part of the arbitration provision that was never challenged. And since that language was "neither brought to the attention of the court nor ruled upon" in *Buckeye*, *Buckeye* has nothing at all—much less anything precedential—to say about its significance here. *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall,* 266 U.S. 507, 511 (1925)).

Moreover, unlike the language in *Buckeye*, the language of the arbitration agreements here requires actually "agreeing to" the broader Terms, not merely the physical act of "signing" them. As in *Macon County Greyhound Park*, where the arbitration agreement was conditioned on "participating in" illegal gambling, conditioning the arbitration agreement and delegation clause on actually "agreeing to" gamble through Stake's site means that the arbitration agreement and delegation clause here are "at least in part, based on illegal gambling consideration." 226 So.3d at 167 (distinguishing *Buckeye*).

In short, because Mr. Wolters specifically challenges the arbitration agreement and delegation clause standing alone as unenforceable gambling

contracts, the Court is required to address those challenges before compelling arbitration.

Second, the arbitration agreement and delegation clause are illusory for the same reason as the entire contract: Stake can amend them "at any time," "effective immediately." App. 117; R. Doc. 16-2, at 30. Indeed, Stake's ability to unilaterally amend the contract at any moment is especially problematic as applied to the arbitration provision and delegation clause. That's because Stake's Terms ensure the company will always know about looming arbitration claims before they are filed, by requiring users always to first exhaust their claim through an informal complaint resolution process that is internal to the company. *See* App. 114–15; R. Doc. 16-2, at 27-28 ("you agree to notify us in writing" and "exhaust[] the internal complaint process"; "only then may you initiate an arbitration"). In practical effect, that means that Stake can always alter or abandon its arbitration obligations *after* it becomes aware of a claim and *before* the claim can be filed.

Stake's power to make unilateral changes that are "effective immediately" therefore means that Stake can "strip the right of arbitration from a party who has already attempted to invoke it." *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 86–88 (1st Cir. 2018). And that is a textbook case of an illusory promise. *Id.* Stake could even choose to eliminate the arbitration agreement or delegation clause altogether if faced with an issue of arbitrability or the merits that



Appellate Case: 26-2459 Page: 51 Date Filed: 11/13/2026 Entry ID: 5705992

it did not want to arbitrate. *See Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) ("Where one party to an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset."); *Johnson v. Menard, Inc.*, 632 S.W.3d 791, 797 (Mo. Ct. App. 2021) (holding that a delegation clause in an employment agreement was illusory and "not enforceable" because the employer "retained the unilateral authority to modify the delegation clause without limit or notice"); *Pizza Hazel*, 2025 WL 3023060, at *7–8 (finding no agreement to arbitrate where "Amex had the power to require plaintiff to arbitrate the covered dispute, while simultaneously reserving the right to modify the agreement").

## IV. Alternatively, Stake has not come forward with sufficient undisputed material facts to establish that a contract was formed.

Even if this Court disagrees with the arguments above, there remains the factual question of whether Mr. Wolters ever actually manifested assent to Stake's Terms. The district court held, in the alternative, that Stake had failed to prove as a matter of law that a contract was formed and that factual disputes remained on that question. Add. 13–15; Appellee's App. 13–15; R. Doc. 26, at 13–15. That is another ground on which this Court can affirm.

This Court has explained that "the existence of mutual assent is generally a 'factual question' that is resolvable … only if the material facts are not in dispute." *Foster v. WalMart, Inc.*, 15 F.4th 860, 865 (8th Cir. 2021). As the movant seeking to compel arbitration, Stake has the burden to show mutual assent, taking the record in the light most favorable to Mr. Wolters. *See Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022). The standard is "akin to summary judgment." *Id.*at 850 (quoting *Duncan v. Int'l Mkts. Live, Inc.*, 20 F.4th 400, 403 (8th Cir. 2021)). So it is Stake's burden "to show initially the absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970).

Establishing assent to an internet contract is "a fact-intensive inquiry" that can be resolved without factfinding only where the terms were "reasonably conspicuous and manifestation of assent unambiguous as a matter of law." *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 76 (2d Cir. 2017). For online terms and conditions like Stake's, "[t]he presentation of the online agreement matters." *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017). The analysis will usually turn on "the structure and design of the website" and other visual elements that might clarify or obscure the putative contract that a consumer is asked to enter into. *Foster*, 15 F.4th at 864.

Though Stake implies otherwise (at 21), simple "classification of web-based contracts alone" into categories such as browse- or click-wrap "does not resolve the notice inquiry." *Meyer*, 868 F.3d at 76. No matter the label, it's important to see the

actual appearance of the website as it was presented to the consumer. A court must know enough to determine "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Otherwise elements of the website or its design might "distract[]" or "actively mislead[] the customer," muddying what otherwise could be clear assent. *Id.* at 1035–36.

Here, Stake failed to meet its burden when it submitted a bare-bones affidavit and minimal accompanying documentation that makes it impossible to tell whether and how Stake's Terms were actually presented to its users. *See, e.g.*, *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1331 (11th Cir. 2016) (denying motion to compel arbitration in part because "there is no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card"). Stake identifies only two occasions on which Mr. Wolters assertedly would have assented to its terms, and its sparse evidence about both instances leaves significant "unexplained gaps" that preclude it from carrying its burden. *Adickes*, 398 U.S. at 158.

First, Stake says that Mr. Wolters presumably must have checked a box next to the statement "I have read and agree to the Terms and Conditions" when he first

created his account in November 2022. But Stake's lone declarant, Mr. Craven, provides no details about the design of the website where that statement appeared. App. 52; R. Doc. 15, at 3. His affidavit does not identify any other text or elements that appeared on the page—not via screenshot, and not via verbal description either. *See id*. Most glaringly, Mr. Craven does not even say that the Terms and Conditions appeared on the website or that users had any opportunity to review them. Stake's lawyers *asserted* to the district court that the relevant Terms were noticeably hyperlinked somewhere during the registration process. But their only claimed evidence for that assertion, Mr. Craven's declaration, says nothing of the sort. *Compare* App. 32, 38; R. Doc. 14, at 6, 12 (brief, citing to the declaration), *with* App. 51–52; R. Doc. 15, at 51–52 (the declaration). It was eminently reasonable for the district court to have follow-up questions, and to insist that they be answered before finding Stake's claim of mutual assent to be undisputed as a matter of law.

Second, Stake says that Mr. Wolters assented to an updated version of its Terms in May 2023. All Mr. Craven says about that purported assent is that Mr. Wolters was presented with "a window" containing the text of the Terms and Conditions, that he would have had to "scroll[] through" the entire terms, and that he then had to check a box affirming that he read and agreed to the terms. App. 52; R. Doc. 15, at 3. Stake also attaches a screenshot, but not one that shows anything about the structure and design of the window or how it would have appeared to a

user. It is just a snippet of an internal database entry purporting to memorialize that he checked that box. App. 52; R. Doc. 15, at 3; App. 56; R. Doc. 16, at 2. Again, that bare-bones evidence raises more questions than it answers: What would the "structure and design" of the window have actually looked like—on any device, let alone Mr. Wolters's? *Foster*, 15 F.4th at 864. How prominent were the terms, and how legible? *See id.* (considering whether terms were "sufficiently conspicuous" and their "exact location and prominence"). Under what "circumstances" was this window presented? *Sgouros*, 817 F.3d at 1034. Stake has provided no information about when or where within its virtual casino this pop-up was programmed to appear, making it impossible to know (for example) whether that context was coercive. *Cf. Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1602 (W.D. Wash. 2019) (holding that the context in which a pop-up window seeking assent to an arbitration clause appeared within a virtual casino app was "coercive"). And why does the screenshot purporting to document Mr. Wolters's assent lack his name but bear a prominent warning label that deems it "outdated"? *See* Add. 14–15; Appellee's App. 14–15; R. Doc. 26, at 14–15. Again, it was Stake's burden to "foreclose[] the possibility" that Mr. Wolters could prevail. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (describing the holding of *Adickes*, 398 U.S. at 158–59). Given the gaps and uncertainties in Stake's evidence, the district court was justified in not



Appellate Case: 26-2459 Page: 56 Date Filed: 11/13/2026 Entry ID: 5705992

yet "being satisfied that the making of the agreement for arbitration … is not in issue." 9 U.S.C. § 4.

Indeed, the district court here was not alone in finding Mr. Craven's averments insufficient. In *Urdan v. Sweepsteaks Limited*, Stake supported a motion to compel arbitration from an Illinois-based user of Stake.us with a similar bare-bones declaration from Mr. Craven. *See* Declaration of Edward Craven, No. 25-cv-3736 (N.D. Ill. July 8, 2025), Dkt. No. 13-1. The court denied the motion without prejudice, holding that "discovery into contractual formation is warranted" because the "sparse information" in Mr. Craven's declaration was insufficient to evaluate contract formation. Order, No. 25-cv-3736 (N.D. Ill. Oct. 16, 2025), Dkt. No. 31.

Subsequent discovery in *Urdan* has borne out the wisdom of that decision. *See* Plaintiff's Opposition to Defendant's Renewed Motion to Compel Arbitration at 1–4, No. 25-cv-3736 (N.D. Ill. May 15, 2026), Dkt. No. 66. It came to light there that Stake actually has no contemporaneous images of what its users saw from August 2022 to May 2023 (the same time period at issue here), and that Mr. Craven "was not involved in the development, implementation, or decisionmaking relating to" the user interfaces that his declaration discusses. *Id.* at 9–10. Moreover, when Stake did its best to reconstruct the account creation interface Mr. Craven was describing from raw source code, the resulting images appeared to show the user interface of Stake.*com*, a different website that Stake operates for international users.

*Id.* at 9. The attempted re-creation also contradicted Mr. Craven's averments about the account creation process in August 2022, including averments he made about text hyperlinking to the Terms. *Id.* at 9–10. Those discrepancies may be why Stake withdrew Mr. Craven as a witness in *Urdan*, *id.* at 10, and may also be why—contrary to Stake's briefing in the district court—any similar claims about hyperlinking to the Terms were omitted from Mr. Craven's declaration in this case. *See supra*, at 46.

Stake says (at 24) that the district court "improperly weighed the evidence and made a credibility determination" when it determined that more factfinding was needed. But it did nothing of the sort. It merely recognized that Stake's evidence had significant gaps and ambiguities, and that therefore Stake has thus far "failed to meet its burden." Add. 15; Appellee's App. 15; R. Doc. 26, at 15; *see Ballou*, 46 F.4th at 851. The "factual question" of assent "is resolvable … only if the material facts are not in dispute." *Foster*, 15 F.4th at 864. Here, even though Stake is the only party with access to the missing specifics of its web interface, the material facts that Stake identified are insufficient. So more factual development is necessary.[10]

---

[10] Stake also protests (at 21, 22–23) that Mr. Wolters "produced no evidence" to *contradict* Mr. Craven's declaration. But before the burden shifts to Mr. Wolters to produce contradictory evidence, Stake must first carry its own burden as the moving party to come forward with sufficient evidence "to show initially the absence of a genuine issue concerning any material fact." *Adickes*, 398 U.S. at 159. Stake failed to do so here.

## V. The remaining unconscionability challenges should be decided by the district court in the first instance.

In the district court, Mr. Wolters argued that several other aspects of the arbitration agreement rendered it unconscionable and unenforceable, *see* App. 252–63; R. Doc. 17, at 24–35, and those grounds apply equally to the arbitration agreement and delegation clause as they do the entire contract, *see supra*, at 37–38 & n.9. For example, Mr. Wolters has argued that Stake's contract makes it practically impossible for most Minnesota users of its website to arbitrate, by forbidding them from hiring a lawyer who has already represented someone else. The same unfairness affects arbitrating threshold issues, given the sheer number of potentially affected users and the relative paucity of suitable lawyers to represent them. *See* App. 254–56; R. Doc. 17, at 26–28. Because the district court did not reach these issues, it should be the one to decide them in the first instance.

Stake asks this Court to hold the delegation clause "is enforceable" as to those unaddressed issues and that they must be sent to arbitration. Opening Br. 24. But that would put the cart before the horse. As just explained, Mr. Wolters's unaddressed unconscionability challenges apply equally to both the delegation clause and the broader arbitration provision, and Mr. Wolters challenged both on the same grounds in the district court. *See supra*, at 37–38 & n.9. Stake has not developed any argument on appeal that the delegation clause is not unconscionable,

so any such contention is forfeited. *See Garden v. Cent. Neb. Housing Corp.*, 719 F.3d 899, 905 n.2 (8th Cir. 2013). That means that if this Court reverses, Mr. Wolters's unconscionability challenges will remain to be addressed on remand.

## CONCLUSION

For the foregoing reasons, Mr. Wolters respectfully asks this Court to affirm the order of the district court denying Stake's motion to compel arbitration.

Dated: November 13, 2026

*/s/ Michael Skocpol*


Garrett D. Blanchfield
REINHARDT WENDORF & BLANCHFIELD
80 South Eighth Street, Suite 900
Minneapolis, MN 55402
(651) 287-2100
*g.blanchfield@rwblawfirm.com*

Daniel C. Hedlund
Daniel J. Nordin
Joe E. Nelson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
*dhedlund@gustafsongluek.com*
*dnordin@gustafsongluek.com*
*jnelson@gustafsongluek.com*

Michael Skocpol
Shelby Leighton
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
*mskocpol@publicjustice.net*
*sleighton@publicjustice.net*

Vildan Teske
Lee Owen
TESKE LAW PLLC
80 South Eighth Street, Ste. 900
Minneapolis, MN 55402
(612) 767-0521
*teske@teskelaw.com*
*owen@teskelaw.com*

*Counsel for Appellee Chris Wolters*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for Mr. Wolters certifies that this brief complies with the type-volume and type-face limitations of Federal Rule of Appellate Procedure 32. The brief has 12,377 words, proportionally spaced using Times New Roman, 14-point font. The brief was prepared using Microsoft Word. Pursuant to Eighth Circuit R. 28A(h), the undersigned attorney also certifies that the brief has been scanned for viruses and, to the best of our ability and technology, believes that it is virus free.

Date: November 13, 2026

*/s/ Michael Skocpol*
Michael Skocpol